IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------x
                                      :
CLAIRE COLLIER                        :          3:05 CV 1677 (PCD)
                                      :
                                      :
v.                                    :
                                      :
JO ANNE B. BARNHART,                  :          DATE: APRIL 25, 2006
COMMISSIONER OF SOCIAL SECURITY       :
                                      :
-------------------------------------------------x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ON
DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

_____This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), as amended, seeks judicial review of a final decision by the Commissioner of Social Security ["Commissioner"], that denied plaintiff Disability Insurance Benefits ["DIB"].

I. ADMINISTRATIVE PROCEEDINGS

_____On January 27, 2004, plaintiff Claire Collier, filed her application for DIB.  (See Certified Transcript of Administrative Proceedings, filed  December 23, 2005 ["Tr."] 24-26). The Commissioner denied the application initially and upon reconsideration.  (See Tr. 27-36).

On November 4, 2004, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"].  (See Tr. 38-44).  Such hearing was held before ALJ Robert A. Di Biccaro on March 14, 2005.  (See Tr. 147-88).  Plaintiff was represented by counsel at the hearing. (See Tr. 37, 147).  On June 10, 2005, ALJ Di Biccaro issued his decision, in which he held that while plaintiff is disabled by Amyotrophic Lateral Sclerosis ["ALS"], plaintiff did not have this impairment prior to December 31, 1999, the last date she was insured by the Social Security Act, so that plaintiff is not entitled to DIB.  (See Tr. 19-22).  Seven days later, plaintiff submitted the first of three letters to the Social Security Administration ["SSA"]

seeking permission to file an expedited appeal to the district court.  (See Tr. 5-15).[1]
Plaintiff's requests for review were denied by the Appeals Council on August 25, 2005,
rendering the ALJ's decision, dated June 10, 2005, the final decision of the Commissioner of
Social Security.  (See Tr. 2-4).

　　　Plaintiff commenced this action on October 28, 2005 to challenge the constitutionality
of  42 U.S.C. § 423(c)(1), commonly referred to as the "20/40 Rule."  (Dkt. #1).[2]  On
December 23, 2005, defendant filed her Answer, with the administrative record attached.
(Dkt. #9).  Pending before the Court are plaintiff's Motion for Summary Judgment, brief,
Local Rule 56(a)1 Statement and affidavits in support, filed January 26, 2006 (Dkts. ##10-
14),[3] and defendant's Motion for Order Affirming the Decision of the Commissioner and brief
in support, filed February 22, 2006.  (Dkts. ##15-16).  On March 6, 2006, plaintiff filed her
brief and affidavit in opposition to defendant's Motion.  (Dkts. ##19-20; see Dkt. #17-18).[4]
Twenty-three days later, United States District Judge Peter C. Dorsey referred this case to
this Magistrate Judge.  (Dkt. #21).

　　　For the reasons stated below, plaintiff's Motion for Summary Judgment (Dkt. #10)

---

[1]Plaintiff's letters, treated as a Request for Review, are dated June 17, July  22, and August
9, 2005.  (See Tr. 5-15).

[2]Attached to plaintiff's Complaint are the following three exhibits: copy of plaintiff's Social
Security and Medicare Earnings Record (Exh. A); copy of ALJ Di Biccaro's June 10, 2005 decision
(Exh B.); and copy of Notice of Appeals Council Action, dated August 25, 2005 (Exh. C).

[3]Attached to the affidavit of Richard F. Hans, sworn to January 25, 2006 (Dkt. #13) are the
following three exhibits: copies of correspondence to the SSA from plaintiff's counsel, dated August
18 & September 30, 2005 (Exhs. 1 & 3); and copy of correspondence from the SSA to plaintiff's
counsel, dated September 15, 2005 (Exh. 2).

[4]Attached to the affidavit of Richard F. Hans, sworn to March 6, 2006 (Dkt. #20) are the
following: copy of tables indicating Allowances and Denials for Anterior Horn Cell Disease at the
Initial Adjudicative Level and Reconsideration Adjudicative Level, prepared September 2005 (Exh.
A); and copy of DVD recording of the Today show, dated May 13, 2005 (Exh. B).

is <u>denied</u> and defendant's Motion for Order Affirming the Decision of the Commission (Dkt.
#15) is <u>granted</u>.

## II. FACTUAL BACKGROUND

Plaintiff is a forty-three year old female who is married with three children.  (<u>See</u> Tr.
24-25, 142).  Plaintiff held summer jobs while she was in college, and after graduation, she
was gainfully employed as a special events coordinator, a banquet sales coordinator, a
secretary and as an administrative assistant for several employers for the next ten years.
(<u>See</u> Tr. 49-50, 53, 111, 166-69).  Over the course of her fifteen years of employment,[5]
plaintiff paid $19,544 to Social Security and $4,668 to Medicare; her employer matched both
amounts.  (<u>See</u> Tr. 53).  Plaintiff testified at her hearing before ALJ Di Biccaro that she
worked "until [she was] about eight and a half months pregnant" and then stopped for the
birth of her first child, Kieran, who was born in September 1994.  (<u>See</u> Tr. 169-70).  Plaintiff
thereafter became a stay-at-home mom for Kieran, Bridget, who was born in May 1996, and
Leah, who was born fourteen months later.  (<u>See</u> Tr. 40, 41, 142, 152-53, 169-72).  While
her daughters were in preschool, in 2000 and 2002, plaintiff was paid for some of the work
she performed for their classes.  (<u>See</u> Tr. 53, 173-75).

In or around March 2003, plaintiff began "feeling twitches in [her] arms" and would
"get cramps in [her] calves and the arches of [her] feet."  (<u>See</u> Tr. 177).  Plaintiff was
diagnosed with Amyotrophic Lateral Sclerosis ["ALS"] by Dr. Dale J. Lange, on October 13,
2003.  (<u>See</u> Tr. 126, 179).   Thereafter, on January 27, 2004, plaintiff filed her application
for DIB. (<u>See</u> Tr. 24-26).   Plaintiff was denied benefits on grounds of insufficient work

---

[5]While plaintiff represents in her brief that she worked 18 calendar years (<u>see</u> Dkt. #11, at
10), her Complaint and her earnings record reflect continuous employment from 1979 to August
1994, which is 15 calendar years. (<u>See</u> Tr. 49-50 & 53; Dkt. #1, ¶ 4).  The difference, however, is
irrelevant.

history. (See Tr. 19-22, 27-29).

In his decision, ALJ Di Biccaro observed that "[a]s a threshold matter, . . . [plainitff]

concedes that she is insured for disability purposes only through December 1999 and that

she had no symptoms of ALS until 2003." (See Tr. 20). Plaintiff therefore "is pursuing this

appeal on constitutional grounds by challenging the provisions of the Social Security Act and

regulations," specifically, 42 U.S.C. § 423(c)(1), and its associated regulations. (Id.).

Accordingly, in his decision, ALJ Di Biccaro observed that he lacks the "authority to disregard

the requirements of the Social Security Act and regulations" so as to find in her favor. (Id.).[6]

### III. STANDARD OF REVIEW

The scope of review  of a Social Security disability determination involves two levels

of inquiry.  The court first must decide whether the Commissioner applied the correct legal

principles in making the determination.    Next, the court must decide whether the

determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79

(2d Cir. 1998).  "Substantial evidence" is evidence that a reasonable mind would accept as

adequate to support a conclusion; it is more that a "mere scintilla." Richardson v. Perales,

402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).   The

---

[6]As ALJ DiBiccaro poignantly observed:

Both [plaintiff] and her husband testified in a forthright, credible and heartfelt
manner. . . . [Plaintiff] has fought courageously against the disease and has done
everything possible to continue in her role as a wife and mother.  Her personal
story is compelling, and her ongoing efforts to raise her children despite the
disease merit admiration.

. . . [Plaintiff] alleges that the disability quarter of coverage rules discriminate
against stay-at-home parents who are more likely than not women.  Unfortunately,
the undersigned does not have the authority to change or disregard the law
regardless of how compelling her story is.

(Tr. 21).

4

substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's findings.  Furthermore, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).[7]  In 2003, the SSA amended its regulations to allow the

---

[7]A number of factors are considered and a five-step process is followed when deciding whether a claimant is disabled.  First, the court determines whether the claimant is engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a).  If the claimant is performing substantial gainful activity, the claim will be disallowed.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, then the second step requires that a finding be made as to the existence of a severe mental or physical impairment; if none exist, the claim is denied.  See 20 C.F.R. § 404.1520(c).  If the claimant has a severe impairment, the third step is to compare the claimant's impairment with those in the Listing.  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listing, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal a listed impairment, then the fourth step is to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant cannot perform his former work, then the fifth step is to show that he is prevented from doing any other work; disability benefits can only be received if a claimant cannot perform any alternate gainful employment.  See Balsamo, 142 F.3d at 80 (citations

SSA to make findings of presumptive disability in Listing 11.10 with respect to claims involving ALS.  <u>See</u> Revised Medical Criteria for Evaluating Amyotrophic Lateral Sclerosis, 68 Fed. Reg. 51689, 51691-92 (Aug. 28, 2003)(to be codified 20 C.F.R. pts. 404 and 416).  Thus, a claimant diagnosed with ALS is presumptively disabled.  In this case, it is undisputed that plaintiff suffers from ALS, which, as stated above, is a medically determinable impairment.  (<u>See</u> Tr. 22).

A claimant's work history is a prerequisite to a determination of eligibility for disability benefits.  Thus, in order for a claimant to qualify for disability benefits, in addition to proving disability under the statute, a claimant must have "insured status."  <u>See</u> 20 C.F.R.

---

omitted).

The initial burden of establishing disability is on the claimant.  <u>See</u> 42 U.S.C. § 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy.  <u>See Balsamo</u>, 142 F.3d at 80 (citations omitted).  This may require application of the Medical-Vocational Guidelines ["the Grid"]; the Grid classifies employment into five groups based on exertional requirements of the different types of work, <u>i.e.</u>, sedentary, light, medium, heavy and very heavy.  <u>See Gray v. Chater</u>, 903 F. Supp. 293, 297-98 n.5 (N.D.N.Y. 1995).  These categories are based on strength requirements of such activities as sitting, walking, standing, lifting, carrying, pushing, and pulling.  <u>See id.</u>  The Grid places claimants with severe exertional impairments who can no longer perform past work into Grid categories according to their residual functional capacity, age, education and work experience, and dictates a conclusion of disabled or not disabled.  <u>See id.</u>, 903 F. Supp. at 298.  When the Commissioner makes a determination as to a claimant's disability, she must explain what physical functions the claimant is capable of performing; "in order to sustain her burden of showing that the claimant can perform sedentary work, the [Commissioner] must proffer specific medical evidence that the plaintiff can meet the exertional demands necessary to maintain sedentary work."  <u>Mitchell v. Chater</u>, 918 F. Supp. 675, 682 (W.D.N.Y. 1995)(citations omitted).

In determining whether or not a claimant is disabled, the Commissioner considers:  (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him; and (4) the claimant's age, educational background, and work history.  <u>See Carroll v. Secretary of HHS</u>, 705 F.2d 638, 642 (2d Cir. 1983)(multiple citations omitted).  In addition, the opinion given by a treating physician is entitled to considerable weight and in the absence of contradictory evidence, is binding on the Commissioner.  <u>See id.</u> (multiple citations omitted).

§ 404.130.[8]  For plaintiff to have disability insured status, plaintiff must satisfy the 20/40 Rule.  See 20 C.F.R. § 404.130(b).  The 20/40 Rule requires that plaintiff have at least 20 quarters of coverage in a 40 quarter period ending with the quarter that she allegedly became disabled.[9]  See 20 C.F.R. § 404.130(b)(2).  The inquiry in this case, therefore, does not relate to the claim of disability or the capacity of plaintiff to perform work related activity, but rather, the constitutionality of 42 U.S.C. § 423(c)(1) which application results in a denial of disability benefits to plaintiff who was only insured for benefits through December 31, 1999. (See Tr. 19-22).  "The phrase 'period of disability' is a legal term, encompassing both a literal disability and fully insured status."  2 SOCIAL SECURITY LAW AND PRACTICE § 13.35, at 34 (1997)(footnote omitted).  Although plaintiff urges this Court to do so, "[t]o interpret the regulation as applying to persons who are not fully insured at the beginning of a period of disability would conflict with the underlying statute".  Id. (footnote omitted); see 42 U.S.C. § 416(i).

## IV. DISCUSSION

ALJ Di Biccaro found that although plaintiff has ALS, which is a medically determinable impairment, and plaintiff has not engaged in substantial gainful activity since the alleged onset of disability, plaintiff did not have this impairment "prior to December 31, 1999; therefore, [plaintiff] did not have a 'severe' impairment prior to her date last insured (20 C.F.R. § 404.1520)."  (See Tr. 21-22).  Accordingly, ALJ Di Biccaro concluded that

---

[8]There are four rules outlined in 20 C.F.R. § 404.130, only one of which, Rule I, is applicable to this case.

[9]A "quarter" of coverage is the basic unit used by the SSA in determining whether a claimant has sufficient coverage under the Act to achieve insured status.  See 20 C.F.R. § 404.140(a). An individual earns "quarters" based on the wages the person was paid during the period of three calendar months ending on March 31, June 30, September 30, or December 31 in any year.  See 42 U.S.C. § 413(a)(1); 20 C.F.R. § 404.101(b).

plaintiff "was not under a 'disability' as defined in the Social Security Act, at any time through the date of this decision as it relates to her date last insured of December 31, 1999 (20 C.F.R. § 404.1520(c))." (Id.).  ALJ Di Biccaro acknowledged, however, that because plaintiff was "pursuing [her] appeal on constitutional grounds by challenging the provisions of the Social Security Act and regulations," ALJ Di Biccaro lacked the "authority to disregard the requirements of the Social Security Act and regulations" so as to find in her favor.  (See Tr. 20).

Plaintiff seeks summary judgment on grounds that the 20/40 Rule denies plaintiff equal protection under the Fifth Amendment as the denial of benefits in this case discriminates against plaintiff and all other women between the ages of 31 and 41 years who stay at home to care for their children and thus are unable to work at least five of the ten previous years, notwithstanding prior work history.  (Dkt. #11, at 7-9).  Additionally, plaintiff asserts that the 20/40 Rule, as applied to plaintiff, violates the due process clause of the Fifth Amendment, as such rule "runs contrary to the policies underlying the Social Security and Medicare systems in general and, in particular, as they have been amended to otherwise specifically accommodate victims of ALS."  (Id. at 10-16).

In her Motion for Order Affirming the Decision, the Commissioner contends that plaintiff has failed to show an equal protection violation as the interests in the government in maintaining the solvency of the Disability Insurance program and in ensuring that disability recipients have been dependent on their wages is legitimate, and the statute bears a rational relationship to that interest.  (Dkt. #16, at 4-10).  According to the Commissioner, plaintiff has not made a showing of a due process violation as due process, as applied to the federal government, requires that a social security disability hearing be full and fair and plaintiff had an opportunity to present her case.  (Id. at 10).  Moreover, the Commissioner contends that

8

the amendments to the Social Security Act, which change the eligibility requirements for Medicare coverage for victims of ALS, do not affect the 20/40 requirement.  (Id. at 11).

In her brief in opposition to the Commissioner's Motion, plaintiff reasserts that the 20/40 Rule denies plaintiff equal protection under the Fifth Amendment as women who leave the workforce to raise children are disproportionately excluded from eligibility for Social Security and Medicare benefits, and the 20/40 Rule contradicts Congress's clear intent to provide immediate assistance to ALS victims and their families.  (Dkt. #19, at 2-5 & 8-9). Plaintiff further contends that defendant has "failed to proffer a shred of proof that the SSDI program is self-sufficient or that [the] eradication [of the 20/40 Rule] would materially undermine that goal," and the standard of review for a procedural due process challenge is not applicable here; rather, the rational basis standard is appropriate as plaintiff challenges the 20/40 Rule on substantive due process grounds.  (Dkt. #19, at 5-8).

A. EQUAL PROTECTION

As stated above, plaintiff contends that the 20/40 Rule denies plaintiff equal protection under the Fifth Amendment as the Rule has a "disparate and discriminatory impact" against plaintiff and other women who "after materially contributing to the Social Security and Medicare Trust Funds, elect to stay home and engage in the mothering of their children." (Dkt. #11, at 7-9; Dkt. #19, at 2-3).  The Commissioner responds that plaintiff has failed to show an equal protection violation in that the government interest "embodied in the '20/40' rule is legitimate" and the statute bears a rational relationship to that interest. (Dkt. #16, at 4-5).

The Fifth Amendment of the U.S. Constitution provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."  "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so

unjustifiable as to be violative of due process." Schneider v. Rusk, 377 U.S. 163, 168 (1964)(internal quotations & citations omitted); see also Nicholas v. Tucker, 114 F.3d 17, 19 (2d Cir. 1997), cert. denied, 523 U.S. 1126 (1998). "It is . . . well-established that the constitutional guarantee of equal protection does not forbid all classifications, but rather keeps governmental [decision makers] from treating different persons who are in all relevant respects alike." Nicholas, 114 F.3d at 20 (internal quotations & multiple citations omitted). Unless the challenged statute "burden[s] a fundamental right or draw[s] on distinctions based on a suspect classification," a Court must "uphold" the legislation if the statute bears a rational relationship "to a legitimate governmental objective." Id. at 20 (citation omitted). Moreover, the Second Circuit has reiterated that the rational basis standard of review applies specifically in cases such as the one at hand, where "[d]istinctions [are] made in [a] social welfare statute[ ]." Brown v. Bowen, 905 F.2d 632, 635 (2d Cir. 1990)(multiple citations omitted), cert. denied, 498 U.S. 1093 (1991); see also Rudykoff v. Apfel, 193 F.3d 579, 580 (2d Cir. 1999)("Constitutional challenges to social welfare legislation such as the Social Security Act are reviewed under the rational basis standard.")(multiple citations omitted). Additionally, the choices made by Congress in enacting the challenged statute "will be upheld unless they are clearly wrong, a display of arbitrary power, [and] not an exercise of judgment." Brown, 905 F.2d at 635 (internal quotations & multiple citations omitted). Thus, "[u]nless a statute employs a classification that is inherently invidious or that impinges on fundamental rights," federal courts should "properly exercise[] only a limited review power over Congress." Schweiker v. Wilson, 450 U.S. 221, 230 (1981)(citation omitted).

There are two ways in which governmental action can violate the equal protection clause. "The first occurs when the Government explicitly classifies or distinguishes among persons" based on specific criteria, such as, race, sex, religion or ethnicity. De La Cruz v.

Tormey, 582 F.2d 45, 49 (9th Cir. 1978), cert. denied, 441 U.S. 965 (1979).[10]  In this case,

there is no claim of this type of facial discrimination.  The "second and more subtle variety

of discrimination focuses, not on the form of the governmental action, as does the first, but

rather its results."  Id. at 50.  This type of discrimination is, in form nondiscriminatory, but

produces "effects which weigh adversely and disproportionately upon the members of a

particular group of individuals."  Id.  This type of discrimination "may require explanation in

terms of non-invidious purposes."  Id.

According to plaintiff, "[s]tudies have shown that 'women with professional degrees

are out of the labor force at a rate about three times that of their male counterparts and they

overwhelming cite family responsibilities as the reason.'" (Dkt. #11, at 7-8, quoting Jerry A.

Jacobs & Janice Fanning Madden, Mommies & Daddies on the Fast Track: Success of Parents

in Demanding Professions, 596 ANNALS OF AM. ACAD. OF POL. & SOC. SCI. 246, 250 (2004)); see

also Samuel Issacharoff & Elyse Rosenblum, Women & the Workplace: Accommodating the

Demands of Pregnancy, 94 COLUM. L. REV. 2154, 2160-65 (1994)["Issacharoff &

Rosenblum"].[11]  Plaintiff correctly observes that the rates of Disability Insurance coverage for

_____

[10]In De La Cruz, the plaintiffs were all young women who challenged the lack of campus
child care facilities in the San Mateo Community College District, asserting a violation of the Equal
Protection Clause of the Fourteenth Amendment on grounds that defendants' actions constituted
intentional, invidious, gender-based discrimination and were arbitrary and unrelated to the
legitimate goal of providing education. 582 F.2d at 48-49.  The Ninth Circuit denied defendants'
motion to dismiss as to the Equal Protection challenge on grounds that "[i]t [was] too early in the
course of this litigation . . . to determine whether the defendants' conduct was free from
discriminatory purpose [and] what level of 'scrutiny' is applicable on the novel facts of this case."
582 F.2d at 59.

[11]Plaintiff posits the following example in support of her argument that the 20/40 Rule
employs a classification that is inherently invidious -- an applicant 31 years old who worked from
ages 21 through 26 years and paid into Social Security and Medicare for five years would be
entitled to SSDI and Medicare benefits under the 20/40 Rule, whereas an applicant 41 years old,
such as the plaintiff when she was diagnosed with ALS, having worked from age 18 through 34,
would not be eligible for SSDI or Medicare.  According to plaintiff, the recency requirements
imposed by the 20/40 Rule, therefore, become more onerous with age, ironically making it more --
not less -- difficult to receive Medicare or SSDI benefits the closer one is to the respective

11

women in their 30's and early 40's are nearly 20% lower than that for men of comparable age; married women are 10% less likely to be insured than single women; and the SSA's records reflect that women between the ages 31 and 41 are far more likely to be rejected by SSA than any other group or age bracket. (Dkt. #11, at 8-9; Dkt. #19, at 2-4, <u>citing</u> Olivia S. Mitchell & John W.R. Phillips, <u>Eligibility for Social Security Disability Insurance</u>, ISSUES IN BRIEF - U. MICH. RETIREMENT RESEARCH CTR. (2001)["Mitchell & Phillips"]).   The sum result is that "working women are less well-protected by Social Security disability insurance than are working men due to their more episodic labor market attachment." <u>See</u> Mitchell & Phillips, at 4.

Plaintiff contends that this "imbalance and disproportionality"[12] that the 20/40 Rule imposes upon mothers equates to invidious discrimination. (Dkt. #19, at 3-4)(citations omitted).  The allegation of a sexually disproportionate impact, standing alone, however, is insufficient to state a violation of the Constitution. <u>See De La Cruz</u>, 582 F.2d at 58. Moreover, "[a] classification does not offend the Constitution because in practice it results in some inequality." <u>Tuttle v. Secretary of Health, Educ. and Welfare</u>, 504 F.2d 61, 63 (10th Cir. 1974)(internal quotations & multiple citations  omitted).  While the "impact of the official action . . . may provide an important starting point" for determining the existence of invidious discrimination, plaintiff must also allege that defendant's course of conduct is susceptible to an inference of intentional discrimination.  <u>See De La Cruz</u>, 582 F.2d at 59

---

qualifying ages of 62 or 65 years.  (Dkt. #11, at 8).

[12]Plaintiff relies on the following language of the Ninth Circuit in <u>De La Cruz</u>: "[O]ne may point to the fact that the effects of the challenged 'policy' do not fall exclusively upon women, . . . but affect as well men with child-rearing responsibilities. . . .  Challenges which rely upon disparate impact inevitably will involve consequences which are not restricted in their operation to one group or another.  The essence of this sort of legal attack is imbalance and disproportionality."  582 F.2d at 57.

(citation omitted).  To determine "whether invidious discriminatory purpose was a motivating factor" demands an inquiry into several evidentiary sources, "including the existence of a 'clear pattern' unexplainable on grounds other than discrimination, the historical background of a decision, the 'specific sequence of events' leading up to the challenged action, and 'departures' from the normal procedural sequences and substantive policies."  <u>Id.</u> at 58-59 (citations omitted).

While plaintiff is correct that "[h]aving children makes it more likely that women will leave the workforce altogether or switch to part-time employment," Issacharoff & Rosenblum, 94 Colum. L. Rev. at 2165 (footnote omitted), so as to reduce or eliminate the number of quarters of coverage a woman accumulates, plaintiff does not point to any evidence giving rise to an inference of intentional discrimination.  <u>See De La Cruz</u>, 582 F.2d at 58-59.  Moreover, as further discussed below, there is no evidence that an "invidious discriminatory purpose was a motivating factor" in the enactment of the 20/40 Rule; there exists no "'clear pattern' unexplainable on grounds other than discrimination"; the legislative history, as discussed below, evidences a rational relationship of the 20/40 Rule to a legitimate governmental objective, and plaintiff points to no departures from the normal procedural sequences and substantive policies applicable to this social welfare legislation.  <u>See Nicholas</u>, 114 F.3d at 20; <u>De La Cruz</u>, 582 F.2d at 59-60.

In addition to the foregoing, when social welfare legislation is challenged, the legislation is "entitled to a strong presumption of constitutionality."  <u>Califano v. Torres</u>, 435 U.S. 1, 5 (1978)(citation omitted)(<u>per curiam</u>).   "Where rational basis scrutiny applies, the Government has no obligation to produce evidence or empirical data to sustain the rationality of a statutory classification, and instead can base its statutes on rational speculation."  <u>Lewis v. Thompson</u>, 252 F.3d 567, 582 (2d Cir. 2001)(internal quotations & multiple citations

13

omitted).  That notwithstanding, the Commissioner asserts that the 20/40 Rule promotes the legitimate interests of ensuring that the Disability Insurance program is self-supporting and ties disability insurance benefits to employment income. (Dkt. #16, at 5-6).[13]

It has been Congress's position that the disability insurance system "should be completely self-supporting from the contributions of covered individuals and  employers" for "as nearly as can be foreseen and thus is actuarially sound."  H.R. Rep. No. 92-231 (1971), reprinted in 1972  U.S.C.C.A.N. 4989, 5111.  As Congress long ago recognized:

> Under a program which provides protection against loss of earnings on account of disability, it is reasonable and desirable that there be reliable means of limiting such protection to those persons who have had sufficiently long and sufficiently recent covered employment to indicate that they probably have been dependent upon their earnings.  It was to meet this purpose that the disability work requirements were designed, and, in most cases, the present work requirements produce results in accordance with this purpose.

S. Rep. No. 2388 (1958), reprinted in 1958 U.S. C.C.A.N. 4218, 4229-30.[14]  Moreover, "[t]he

---

[13]Plaintiff contends that the Commissioner should "not hide behind the skirts of a long ago discredited myth of self-sufficiency." (Dkt. #19, at 6).  Plaintiff posits that an assertion that the Social Security system is self-supporting "strains credibility" as the Director of the Congressional Budget Office has predicted that "under current law . . . the Social Security trust funds would become exhausted in 2052; after that, the [SSA] would lack the authority to pay full benefits and, without congressional action, outlays would be limited to annual revenues, which would be 22 percent lower than scheduled costs." (Dkt. #19, at 5-6, quoting Statement of Douglas Holtz-Eakin, Director of Congressional Budget Office, "The Future of Social Security before the Special Committee on Aging, United States Senate," at 2-7 (February 3, 2005)).  Moreover, plaintiff argues that defendant has failed to "proffer a shred of proof that the SSDI program is self-sufficient, she has not proffered any evidence that the 20/40 Rule in fact supports a goal of self-sufficiency or that its eradication would materially undermine the goal." (Dkt. #19, at 6).

On the contrary, the Commissioner has proffered evidence that the 20/40 Rule supports the goal of self-sufficiency and that notwithstanding, the statute had a "rational basis when enacted" regardless of the current projections of the funding of social security.  See Brown, 905 F.2d at 637.  Moreover, Congress determines the entitlement to benefits and "[i]t is the responsibility of Congress, not the courts, to determine how public funds should be spent and how they should be raised," and accordingly, to determine how the goal of self-sufficiency shall continue to be met with the present day funding challenges that face the social security programs.  Id. at 635.

[14]To address the inevitable inequity that arises under the 20/40 Rule, namely, the existence  of a disability severe enough to cause a person to stop working, yet not severe enough

14

Supreme Court has recognized that a State has a legitimate interest in maintaining the self-supporting nature of its insurance program" and this "stated principle also applies to the federal government." <u>Tuttle</u>, 504 F.2d at 63 (internal quotations & citation omitted).

Additionally, the 20/40 Rule has been upheld as constitutional under both the Equal Protection and Due Process Clauses of the Fifth Amendment. <u>See Harvell v. Chater</u>, 87 F.3d 371 (9th Cir. 1996)(<u>per curiam</u>); <u>Tuttle</u>, 504 F.2d 61.  In <u>Tuttle</u>, the Tenth Circuit rejected the constitutional challenge to the 20/40 Rule, brought by a plaintiff who became disabled when he had social security credits for only 19 calendar quarters of work, on grounds that 20/40 Rule, which allows for the entitlement of benefits as determined by Congress, has a rational basis and is free from invidious discrimination. <u>Tuttle</u>, 504 F.2d at 62-63.  Likewise, the Ninth Circuit rejected the constitutional challenge of the plaintiff in <u>Harvell</u> who was "fully insured" within the meaning of the Social Security Act, but because he worked in non-covered employment and paid no social security taxes, he earned no quarters of coverage. <u>Harvell</u>, 87 F.3d at 373.   Following the Tenth Circuit's decision in <u>Tuttle</u>, the Ninth Circuit concluded that the 20/40 Rule is not a "patently arbitrary classification, utterly lacking in rational justification." <u>Harvell</u>, 87 F.3d at 373 (citation omitted).

Moreover, as another district court held two years ago, the 20/40 Rule does not violate equal protection under the Fifth Amendment because it distinguishes between homemakers and those employed outside the home. Specifically, U.S. Magistrate Judge

---

to meet the definition of disability, the legislative history of this statute reads:

> The requirement of 20 quarters of coverage out of the 40 calendar quarters ending with the quarter of disablement, together with the fully insured status requirement, should provide reasonable and adequate assurance that the protection afforded by the disability provisions will be keyed to loss of earnings on account of disability.

S. Rep. No. 2388 (1958), <u>reprinted in</u> 1958 U.S.C.C.A.N. 4218, 4230.

Evans of the District Court for the Central District of Illinois found:

> this supposed discrimination is not sex-based -- 42 U.S.C. § 414 applies equally to both men and women who . . . were employed outside the home intermittently. [Plaintiffs] present no evidence that homemakers are a suspect class entitled to either strict scrutiny or heightened scrutiny. . . . The Supreme Court has held that a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  In addition, under rational basis scrutiny, the means need only be rationally related to a conceivable and legitimate end.
>
> [T]here is a rational basis for the means employed (the quarters of coverage system), to achieve the intended purpose (determining applicants' eligibility for Social Security benefits, while allowing the program to be self-supporting, and assuring that those receiving benefits were primarily dependent on their lost wages). Therefore, [plaintiff] cannot show that 42 USC § 414 violates the equal protection principles inherent in the Due Process Clause.

See Winger v. Barnhart, 320 F. Supp. 2d 741, 747 (D. Ill. 2004)(internal quotations, citations & footnote omitted).

Accordingly, although this Court is deeply sympathetic to plaintiff's tragic plight,[15] Congress's legitimate goals, in enacting the 20/40 Rule, of making the social security system self-sufficient by tying substantial contributions to the system before the onset of disability to an established attachment to the labor force so that disability claimants may demonstrate a dependence on their employment income, cannot be said to be patently arbitrary or lacking rational justification.  Any revisions to the 20/40 Rule, to rectify the predicament of plaintiff's situation, ought to be initiated by the legislative, and not judicial, branch of government.

---

[15]See note 6 supra.

16

        B. DUE PROCESS CLAUSE

        Plaintiff further argues that denying her SSDI benefits after she has paid social security taxes during the 15 calendar years[16] in which she was employed, is patently unjust and cruel, and runs contrary to the polices underlying the Social Security and Medicare systems in general, and, in particular, as they have been amended to otherwise specifically accommodate victims of ALS.   (Dkt. #11, at 10-16; Dkt. #19, at 8-9).  The Commissioner responds that plaintiff has not made a showing of a due process violation as she was afforded an opportunity to present her claim for disability benefits at an administrative hearing, and the amendments to the Social Security Act do not affect the 20/40 requirement. (Dkt. #16, at 10).

        Plaintiff correctly refers to <u>Weinberger v. Wiesenfeld</u>, 420 U.S. 636, 643-44 (1975), which observed that Congress's intent in enacting and amending the Social Security Act was to "afford more adequate protection to the family as a unit" and that "[u]nderlying the 1939 [amendments] was the principle that under a social-insurance plan the primary purpose is to pay benefits in accordance with the probable needs of the beneficiaries[, like plaintiff in this case,] rather than to make payment to [his or her] estate." (internal quotations & citation omitted).   However, in addition to furthering the goal of protecting the family as a unit, Congress enacted the 20/40 Rule with the legitimate goals of making the social security system self-supporting by assuring that disability claimants make a substantial contribution to the system before the onset of disability and of screening out claimants who have not established an attachment to the labor force for a sufficient amount of time to demonstrate that they have depended on their employment income. <u>See</u> 2 SOCIAL SECURITY LAW AND

---

        [16]<u>See</u> note 5 <u>supra</u>.

17

PRACTICE § 14.27, at 37-38 (citations omitted).[17]

"It is the responsibility of Congress, not the courts, to determine how public funds should be spent" and to legislate within the lines they must draw to ensure the economic viability of the social welfare programs. Brown, 905 F.2d at 635 (internal citations omitted). In that vein, and in light of the goals articulated above, Congress has exercised its judgment so as to favor victims of ALS, in amending the Social Security Act to allow for a waiver of the 24-month waiting period for Medicare coverage for individuals who have filed an application, who are under a disability, and unlike plaintiff, who are insured for disability benefits. See H.R. Rep. No. 106-1019(I) (2000); see also 42 U.S.C. § 426(h); 42 U.S.C. § 426(b)(2)(A); 42 U.S.C. § 423(a). Moreover, in 2003, the SSA amended its regulations to allow the SSA to make findings of presumptive disability with respect to claims involving ALS. See Revised Medical Criteria for Evaluating Amyotrophic Lateral Sclerosis, 68 Fed. Reg. 51689, 51691-92 (Aug. 28, 2003)(to be codified 20 C.F.R. pts. 404 and 416). The foregoing notwithstanding, the Commissioner correctly observes that the amendments to the Social Security Act and to the regulations do not affect the 20/40 requirement. "[T]his Court properly exercises only a limited review power over Congress" as the 20/40 Rule does not include "a classification that is inherently invidious or that impinges on fundamental rights." Schweiker, 450 U.S. at 230 (citation omitted). Accordingly, this Court is bound to uphold the choices made by the legislature as they are not "clearly wrong [or] a display of arbitrary power." Brown, 905 F.2d at 635 (citations omitted).

In addition to the foregoing, "[w]hether a Social Security Act classification is attacked on equal protection grounds . . . or on due process grounds, . . . the test [that this Court

---

[17]See note 14 supra.

must apply] is whether the statute manifests a patently arbitrary classification, utterly lacking in rational justification." Tuttle, 504 F.2d at 62 (internal quotations & citations omitted). "Although Congress has great latitude to make classifications in the area of economic and welfare legislation," the federal government must have "some rational basis or be pertinent to some proper objective of Congress" in enacting such legislation in order to withstand a due process challenge. See Davis v. Richardson, 342 F. Supp. 588, 591 (D. Conn.), aff'd mem., 409 U.S. 1069 (1972).[18]  To satisfy this standard, plaintiff must carry her "heavy burden of proof of the system's arbitrary or irrational nature." Winger, 320 F. Supp. 2d at 746.

In contrast to the goals outlined by the Commissioner which have been recognized as rationally related to the legislative purpose underlying the Social Security system, see Harvell, 87 F.3d 371; Tuttle, 504 F.2d 61, plaintiff has failed to demonstrate how the quarters of coverage system is incapable of achieving those goals. See Winger, 320 F. Supp. 2d at 745-46.  Thus, for the reasons stated in Section IV.A. supra, plaintiff's constitutional challenge on due process grounds cannot survive.

<u>V. CONCLUSION</u>

For the reasons stated above, plaintiff's Motion for Summary Judgment (Dkt. #10) is denied and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #15) is granted.[19]

---

[18]Plaintiff correctly observes that the rational basis standard, as stated above, applies to plaintiff's constitutional challenge and that defendant's assertion that due process is satisfied because plaintiff received a "full and fair hearing" is misplaced.  See Yancey, 145 F.3d at 112 (when a challenge is made on procedure due process grounds, due process "requires that a social security hearing must be full and fair." )(citation omitted).

[19]The Magistrate Judge commends Attorneys Richard F. Hans, John Vukelj, and John P. Regan and Assistant United States Attorney Ann M. Nevins for their comprehensive and well written briefs on this novel legal question, and further commends plaintiff Claire Collier and her

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)(**written objection to ruling must be filed within ten days after service of same**); FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)(**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to the Second Circuit**).

Dated this 25th day of April, 2006, at New Haven, Connecticut.


_____/s/_____
Joan Glazer Margolis
United States Magistrate Judge

---

husband William for their courage, devotion, and selfless efforts.  This is a significant issue which Congress should address as promptly as possible.