UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLAIRE COLLIER, | : | |
|     Plaintiff, | : | |
| | : | |
|         -vs- | : | Civil No. 3:05cv1677  (PCD) (JGM) |
| | : | |
| JO ANNE B. BARNHART, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
|     Defendant. | : | |

**RULING ON PLAINTIFF'S OBJECTIONS TO THE
MAGISTRATE JUDGE'S RECOMMENDED RULING**

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), as amended, seeks judicial review of a final decision by the Commissioner of Social Security (the "Commissioner"), in which she found that Plaintiff was not entitled to Disability Insurance Benefits ("DIB").  Currently pending are Plaintiff's Motion for Summary Judgment [Doc. No. 10] and Defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 15].  On April 25, 2006, Magistrate Judge Joan Glazer Margolis issued a Recommended Ruling [Doc. No. 22] denying Plaintiff's Motion for Summary Judgment and granting Defendant's Motion for Order Affirming the Decision of the Commissioner ("Recommended Ruling").  Plaintiff filed her Objections to the Recommended Ruling [Doc. No. 23] on May 8, 2006.[1]  For the reasons that follow, the Recommended Ruling is **approved** and **adopted**.

**I.     FACTUAL AND ADMINISTRATIVE BACKGROUND**[2]

---

[1]  Defendant did not file any objections to the Recommended Ruling or any response to Plaintiff's objections.

[2]  Familiarity with Magistrate Judge Margolis's comprehensive ruling detailing the facts and circumstances underlying this dispute is presumed.

Plaintiff is a forty-three year-old female who is married with three children and who worked consecutively for fifteen years, from 1979 to August 1994. (See Certified Transcript of Administrative Proceedings, filed December 23, 2005 ("Tr."), 24-25, 49-50, 53, 142.)  Over the course of her fifteen years of employment, Plaintiff paid $19,544.00 to Social Security and $4,668.00 to Medicare; her employer matched both amounts. (See Tr. 53.)  Plaintiff stopped working in 1994 when she was eight months pregnant with her first child, and thereafter became a stay-at-home mother. (See Tr. 40, 41, 142, 152-53, 169-72.)  On October 13, 2003, after complaining about twitches in her arms and cramps in her calves and the arches of her feet, Plaintiff was diagnosed with Amyotrophic Lateral Sclerosis ("ALS") by Dr. Dale J. Lange. (See Tr. 126, 179.)

Plaintiff filed her application for DIB on January 27, 2004. (See Tr. 24-26.)  The ALJ found that "ALS has taken a great toll on [Plaintiff's] physical and mental heath, and on her family and finances," and that she "has fought courageously against the disease," however, Plaintiff was denied disability benefits on the ground that her work history was insufficient. (See Tr. 19-22, 27-29.)  Specifically, the ALJ found that because Plaintiff was not severely impaired prior to December 31, 1999, her last date insured, she was not under a "disability" as defined in the Social Security Act, 20 C.F.R. § 404.1520(c). (See Tr. 21-22.)  Plaintiff conceded that she was insured for disability purposes only through December 1999 and that she had no symptoms of ALS until 2003, and accordingly, was challenging the provisions of the Social Security Act and regulations, specifically, 42 U.S.C. § 423(c)(1), on constitutional grounds.  The ALJ, however, observed in his decision that he lacked "the authority to disregard the requirements of the Social Security Act and regulations" so as to decide in Plaintiff's favor.

(See Tr. 20.)

This Court referred the parties cross-motions for summary judgment to Magistrate Judge Joan Glazer Margolis. In her Recommended Ruling, Magistrate Judge Margolis recommended that this Court deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for an Order Affirming the Decision of the Commissioner. Like the Commissioner, Magistrate Judge Margolis found that Plaintiff was not fully insured, and thus was not eligible for disability benefits under the Social Security Act. In addressing Plaintiff's constitutional claims, Magistrate Judge Margolis held that the 20/40 rule is not "patently arbitrary or lacking rational justification" and is "rationally related to the legislative purpose underlying the Social Security System," and as such, does not deny Plaintiff equal protection under the Fifth Amendment and does not violate the due process clause of the Fifth Amendment. (Recomm. Ruling 16, 19.)

## II.     DISCUSSION

### A.     Standard of Review of a Magistrate Judge's Recommended Ruling

In the face of an objection to a Magistrate Judge's recommended ruling, the District Court makes a de novo determination of those portions of the recommended ruling to which an objection is made. Smith v. Barnhart, 406 F. Supp. 2d 209, 212 (D. Conn. 2005). This Court may accept, reject, or modify the recommended ruling, receive further evidence, or recommit the matter to the Magistrate Judge with instructions. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

### B.     Standard of Review of a Social Security Disability Determination

A court reviewing the decision of an ALJ will set aside the decision only if it finds that the ALJ failed to properly apply correct legal principles in making a determination or if the

3

decision is unsupported by "substantial evidence." See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (internal quotation and citation omitted); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). Thus, this Court must accept the decision of the ALJ unless it is based on legal error or not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). This "substantial evidence" standard also applies to inferences and conclusions drawn from findings of fact. See Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The district court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). In reviewing the ALJ's decision, the court must consider the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). Furthermore, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998).

    **C.**    **Discussion of Recommended Ruling and Objections Thereto**

Under the Social Security Act, every individual who suffers from a "disability" is entitled

to receive disability insurance benefits. See 42 U.S.C. § 423(d)(1)(A).[3] The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In 2003, the Social Security Administration ("SSA") amended its regulations to allow the SSA to make findings of presumptive disability in Listing 11.10 with respect to claims involving ALS. See Revised Medical Criteria for Evaluating Amyotrophic Lateral Sclerosis, 68 Fed. Reg. 51689, 51691-92 (Aug. 28, 2003) (to be codified 20 C.F.R. pts. 404 and 416). Thus, a claimant diagnosed with ALS is presumptively disabled. It is undisputed in this case that Plaintiff suffers from ALS, a medically determinable impairment. (See Tr. 22.)

In order to qualify for disability benefits, a claimant must, in addition to proving that she

---

[3] In reviewing disability claims, the SSA follows a five-step procedure. See 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." If the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" which is of the required duration and which significantly limits his or her ability to work. If the claimant is engaged in substantial gainful activity and/or does not exhibit a sufficiently severe impairment, the claim will be disallowed. See 20 C.F.R. § 404.1520(a)-(c). Where both conditions are met, however, the Commissioner then compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or "equals" one of the listed impairments, he or she is considered "disabled" and qualifies for benefits without further inquiry. See 20 C.F.R. § 404.1520(d). If, however, the claimant does not qualify under the listings, the Commissioner must then determine whether the claimant can perform his or her own past work. See 20 C.F.R. § 404.1520(e)-(f). If it is found that the claimant cannot do so, then the Commissioner will assess the claimant's present job qualifications and determine whether there are other jobs that the claimant could perform. See 20 C.F.R. § 404.1520(g); see also generally Heckler v. Campbell, 461 U.S. 458, 460-61, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The claimant bears the initial burden of proving that he or she is disabled, however, if the claimant can establish the existence of an impairment that renders him or her unable to perform his or her own past work, the burden then shifts to the Commissioner to show that there is another job in the national economy which the claimant could perform. See Balsamo, 142 F.3d at 80.

is "disabled" under the statute, show that she has "insured status." See 20 C.F.R. § 404.130.[4]  For Plaintiff to show that she has insured status for the purpose of obtaining disability benefits, she must satisfy Rule I, or the "20/40 rule," 20 C.F.R. § 404.130(b).  Under the 20/40 rule, Plaintiff is required to show that she had at least twenty quarters of coverage in the forty quarter period ending with the quarter in which she eventually become disabled. See 20 C.F.R. § 404.130(b)(2).[5]  It is undisputed that Plaintiff did not have "insured status" on October 13, 2004, when she was diagnosed with ALS.  She was only insured for benefits through December 31, 1999, the end of the last of forty quarters during which Plaintiff was covered for twenty quarters. (See Tr. 19-22.)  To interpret the regulation as applying to persons who are not fully insured at the beginning of a period of disability would conflict with the underlying statute. See 2 SOCIAL SECURITY LAW AND PRACTICE § 13.35, at 34.  As such, the inquiry in this case is confined to the constitutionality of 42 U.S.C. § 423(c)(1), which, as applied, results in the denial of disability benefits to Plaintiff.

      1.     Fifth Amendment Equal Protection Claim

Plaintiff contends that the 20/40 rule denies Plaintiff equal protection under the Fifth Amendment because the rule has a "disparate and discriminatory impact" upon Plaintiff and other women who, "after materially contributing to the Social Security and Medicare Trust Funds, elect to stay home and engage in the mothering of their children." (Pl.'s Mem. Supp. Mot.

---

[4] There are four rules outlined in 20 C.F.R. § 401.130, however, only Rule I is applicable to this case.

[5] A "quarter" of coverage, as used in the regulations, "is the basic unit of social security coverage used in determining a worker's insured status." 20 C.F.R. § 404.140(a).  An individual earns "quarters" based on the wages he or she was paid during the period of three calendar months ending on March 31, June 30, September 30, or December 31 of any year. See 42 U.S.C. § 413(a)(1); 20 C.F.R. § 404.101(b).

Summ. J. 7-9; Pl.'s Mem. Opp. Def.'s Mot. Affirm 2-3.)  In response, Defendant argues that Plaintiff has failed to show an equal protection violation because the governmental purposes underlying the 20/40 rule are legitimate ones and the statute bears a rational relationship to those purposes. (Def.'s Mem. Supp. Mot. Affirm 4-5.)

Although the Fifth Amendment does not contain an equal protection clause, "it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" Schneider v. Rusk, 377 U.S. 163, 168, 84 S. Ct. 1187, 1190, 12 L. Ed. 2d 218, 222 (1964) (quoting Bolling v. Sharpe, 347 U.S. 497, 499, 74 S. Ct. 693, 98 L. Ed. 884 (1954)).  The standards for analyzing equal protection claims under the Fifth Amendment and the Fourteenth Amendment are identical. See Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975).

The equal protection guarantee does not forbid all classifications; a statute that does not "burden a fundamental right or draw distinctions based on a suspect classification" will be upheld if it bears a rational relationship to a "legitimate governmental objective." Nicholas v. Tucker, 114 F.3d 17, 20 (2d Cir. 1997); see also Dandridge v. Williams, 397 U.S. 471, 485-86, 90 S. Ct. 1153, 25 L. Ed. 2d 491, reh'g denied 398 U.S. 914, 26 L. Ed. 2d 80, 90 S. Ct. 1684 (1970) (holding that a classification with some "reasonable basis. . . does not offend the Constitution simply because [it] is not made with mathematical nicety or because in practice it results in some inequality") (internal quotations & citation omitted).  Both the Supreme Court and the Second Circuit have held that rational basis review applies to challenges to distinctions made in the context of social welfare statutes, as is at issue in this case. Brown v. Bowen, 905 F.2d 632, 635 (2d Cir.), cert. denied, 498 U.S. 1093 (1991); see also Dandridge, 397 U.S. at 487

(noting that "the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients"). It is well-settled that Congress has wide latitude to create classifications that allocate noncontractual benefits under a social welfare program. Weinberger v. Salfi, 422 U.S. 749, 776-777 (1975); Flemming v. Nestor, 363 U.S. 603, 609-610 (1960). In Flemming, 363 U.S. at 611, the Supreme Court said:

> Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification.

In such a case, the legislature's choices will be upheld unless they are "clearly wrong, a display of arbitrary power, not an exercise of judgment." Bowen v. Owens, 476 U.S. 340, 345, 106 S. Ct. 1881, 1885, 90 L. Ed. 2d 316 (1986); see also Mathews v. De Castro, 429 U.S. 181, 185, 97 S. Ct. 431, 434, 50 L. Ed. 2d 389 (1976) ("the challenged statute is entitled to a strong presumption of constitutionality"). In sum, if social welfare statutes have a rational basis and do not engage in invidious discrimination, they do not violate the equal protection clause, regardless of whether flaws may be found in their logic. Brown, 905 F.2d at 635; see also Dandridge, 397 U.S. at 486 (noting that "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific," and holding that federal courts have no power to impose "their views of what constitutes wise economic or social policy").

       There are two ways in which governmental action can violate the equal protection clause. First, the courts can strike down a statute when Congress "explicitly classifies or distinguishes

among persons" based on specific criteria, such as race, gender, religion, or ethnicity. De La Cruz v. Tormey, 582 F.2d 45, 49-50 (9th Cir. 1978). Even where there is no "facial discrimination," as in this case, there may still exist a second and "more subtle" form of discrimination, which focuses on the effects rather than the form of governmental action. Id. at 50. This type of discrimination involves decisions or actions which, although facially nondiscriminatory, "produce effects which weigh adversely and disproportionately upon the members of a particular protected group of individuals, [and] may require explanation in terms of non-invidious purposes." Id.

In her Recommended Ruling, Magistrate Judge Margolis cited and did not dispute the studies cited by Plaintiff showing that (1) women are more likely than men to leave the workforce to care for their children and raise their families, and (2) as a result, women are substantially less likely than men to qualify for Social Security Disability Insurance ("SSDI") benefits. (See Recomm. Ruling 11-12, 13.)[6] Magistrate Judge Margolis declined, however, to

---

[6] Plaintiff produced, and Magistrate Judge Margolis discussed, a number of compelling studies. (See generally Pl.'s Mem. Supp. Mot. Summ. J. 7-9; Pl.'s Mem. Opp. Def.'s Mot. Affirm 2-4; Recomm. Ruling 12-13.) Specifically, Plaintiff cited studies going to show that "women with professional degrees are out of the labor force at a rate about three times that of their male counterparts and they overwhelmingly cite family responsibilities as the reason. Jerry A. Jacobs & Janice Fanning Madden, Mommies & Daddies on the Fast Track: Success of Parents in Demanding Professions, 596 ANNALS OF AM. ACAD. OF POL. & SOC. SCI. 246, 250 (2004); see also Samuel Issacharoff & Elyse Rosenblum, Women & the Workplace: Accommodating the Demands of Pregnancy, 94 COLUM. L. REV. 2154, 2160-65 (1994). Specifically, Issacharoff and Rosenblum found that "[h]aving children makes it more likely that women will leave the workforce altogether or switch to part-time employment." Issacharoff & Rosenblum, at 2165. Moreover, the evidence shows that (1) the rates of Disability Insurance coverage for women in their early thirties and early forties are nearly twenty percent lower than those for men of comparable ages; (2) married women are ten percent less likely to be insured than single women; and (3) the SSA's records reveal that women between the ages of thirty-one and forty-one are more likely to be rejected by the SSA than any other group or age bracket. Olivia S. Mitchell & John W.R. Phillips, Eligibility for Social Security Disability Insurance, ISSUES IN BRIEF—U. MICH. RETIREMENT RESEARCH CTR. (2001). As a result, "working women are less well-protected by Social Security disability insurance than are working men due to their more episodic labor market attachment." See Mitchell & Phillips, at 4.

find that this evidence gave rise to an inference of intentional discrimination. (Id. 12-13.)

Plaintiff, in her Objections to the Recommended Ruling, argues that because the evidence and findings in Plaintiff's studies are undisputed, the Court should find that "the law itself necessarily and invidiously discriminate[s] against women and in particular women who left the workforce." (Pl.'s Objs. to Recomm. Ruling 2-3.) Plaintiff cites data produced by the SSA in response to a Freedom of Information Act request, which reveals that women between the ages of thirty-one and forty-one are more likely to be rejected by the SSA than are women or men in general. (See Pl.'s Objs. to Recomm. Ruling 4 (citing Exh. A to Hans Aff.).) Specifically, the data shows that upon initial application, 4.99 percent of all men and 4.86 percent of all women with either ALS or Anterior Horn Cell disease are denied at the initial application stage, whereas 7.85 percent of women between the ages of thirty-one and forty-one are denied benefits. (Id.)[7] At the reconsideration stage, only 25.1 percent of all men and 25.6 percent of all women are again denied benefits, however, 57.1 percent of women between the ages of thirty-one and forty-one are again denied benefits. (Id.)[8]

Although Plaintiff's studies, and particularly her own plight, are compelling, the Supreme Court has made it clear that facially neutral official action does not violate the Equal Protection

---

[7] The table provides data for 1994 through 2005, and although women between the ages of thirty-one and forty-one are shown to have been denied benefits at a higher rate than men or women as a whole, these women also applied for and were denied benefits in significantly lower numbers. Notably, zero women between the ages of thirty-one and forty-one were denied benefits in 1999, 2003, and 2005. (Exh. A to Hans Aff.)

[8] Again, because of the very small sample size, it is unlikely that the difference would be found to be significant.

Clause simply because it has a disproportionate impact on a specific group.[9] Washington v. Davis, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976); Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); see also De La Cruz, 582 F.2d at 58.  Plaintiff must also plead and prove intentional discrimination. Plaintiff must prove only that a discriminatory purpose was one motivating factor in the decision; she need not show that the challenged statute rested solely on a discriminatory purpose. Arlington Heights, 429 U.S. at 265-66.  A determination of whether intentional discrimination was a factor in challenged governmental action requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and necessitates the production of other evidence, such as "the existence of a 'clear pattern' unexplainable on grounds other than discrimination, the historical background of a decision, the 'specific sequence of events' leading up to the challenged action, and 'departures' from the normal procedural sequences and substantive policies." Id. at 58-59 (quoting Arlington Heights, 429 U.S. at 266-68).

This Court, like the Magistrate Judge, finds that Plaintiff has failed to prove intentional discrimination.  Specifically, she has failed to cite any evidence going to show that Congress, in enacting the 20/40 rule, intended to discriminate against women, or more specifically, against non-working mothers.  Conversely, there is a great deal of authority with regard to Congress' "actual purpose" in enacting the rule.

There are two primary legitimate objectives behind the 20/40 rule.  Congress' first objective was to create a self-supporting program. See Tuttle v. Sec'y of Health, Education &

---

[9] The effects of the challenged rule do not fall exclusively upon women, but also impact men with child-rearing responsibilities.  This fact, however, is not a bar to a finding of discriminatory impact so long as Plaintiff can show "imbalance and disproportionality." See De La Cruz, 582 F.2d at 57.

Welfare, 504 F.2d 61, 62-63 (10th Cir. 1974) (citing S. Rep. No. 1987, 83rd Cong. 2d Sess., 3 U.S. Code Cong. News, 1954, at 3733; H. Rep. No. 92-231, 92d Cong. 2d Sess., 3 U.S. Code Cong. & Admin. News, 1972, at 5111). Courts have recognized that "maintaining the self-supporting nature of [an] insurance program" is a legitimate governmental interest. Id. at 63 (quoting Geduldig v. Aiello, 417 U.S. 484, 496, 94 S. Ct. 2485, 41 L. Ed. 2d 256 (1974)); see also Lerner v. Richardson, 393 F. Supp. 1387, 1391 (E.D. Pa. 1975) (holding that "where the funds available under a social welfare program are finite, it is reasonable for Congress to build into the system a safeguard against disproportionately high payments to those who have made the smallest contributions"). The 20/40 rule is rationally related to and promotes this objective by ensuring that persons make some substantial contribution to the social security system prior to the onset of disability. Tuttle, 504 F.2d at 63.

Second, Congress intended to provide disability benefits to those who were dependent on their employment income. Id. (citing S. Rep. No. 2388, 85th Cong. 2d Sess., 3 U.S. Code Cong. & Admin. News 1958, at 4229 ("it is reasonable and desirable that there be reliable means of limiting such protection to those persons who have had sufficiently long and sufficiently recent covered employment to indicate that they probably have been dependent upon their earnings"); S. Rep. No. 1987, 83rd Cong. 2d Sess., 3 U.S. Code Cong. News 1954, at 3729). The Social Security program was designed to "afford protection to working members of the nation's economy," and as such, is based in part on Congress' determination "that those who in their productive years were functioning members of the economy may justly call upon that economy, in their later years, for protection from the 'rigors of the poor house.'" Lerner, 393 F. Supp. at 1391 (quoting Helvering v. Davis, 301 U.S. 619, 641, 57 S. Ct. 904, 909, 81 L. Ed. 1307 (1937)).

Again, the 20/40 rule is rationally related to and promotes this objective by "screen[ing] out those who have not established a substantial attachment to the labor force because they do not have a reasonably long, as well as recent, record of covered earnings." Tuttle, 504 F.2d at 63.

Plaintiff argues that the goal of self-sufficiency is an "insufficient justification for discrimination," asserting that there is no evidence that the Social Security program has at any time been self-sufficient, nor that elimination of the 20/40 rule would be an impediment to that goal. (Pl.'s Objs. to Recomm. Ruling 5.)  Moreover, Plaintiff argues that even if this Court were to accept self-sufficiency as a legitimate goal of the Social Security program, it does not justify the denial of Medicare benefits, which Plaintiff seeks and needs. (Id.)  This argument, however, is not persuasive.  As set forth above, Congress had multiple reasons for enacting the 20/40 rule, both of which have been held to be legitimate and both of which are rationally related to the rule. See, e.g., Geduldig v. Aiello, 417 U.S. at 496 (holding, in the context of a state disability insurance program, that "[t]he State has a legitimate interest in maintaining the self-supporting nature of its insurance program," and "in distributing the available resources in such a way as to keep benefit payments at an adequate level for disabilities that are covered, rather than to cover all disabilities inadequately").  Even if the goal of self-sufficiency were rejected, it remains the case that one legitimate purpose behind the enactment of the 20/40 rule was Congress' desire to preserve disability benefits for those persons who are currently dependent on their employment income.

Numerous courts have upheld the 20/40 rule as constitutional under both the Equal Protection and Due Process Clauses of the Fifth Amendment. See, e.g., Harvell v. Chater, 87 F.3d 371 (9th Cir. 1996) (per curiam); Tuttle, 504 F.2d 61; Winger v. Barnhart, 320 F. Supp. 2d

13

741 (C.D. Ill. 2004); Hesse v. Harris, No. 78 C 5176, 1980 U.S. Dist. LEXIS 10122, at *3-4 (N.D. Ill. Jan. 31, 1980).  For the reasons discussed above, this Court also finds that the 20/40 rule is rationally related to the legitimate goals of the Social Security program.  Because the rule is not a "patently arbitrary classification, utterly lacking in rational justification," Harvell, 87 F.3d at 375, it is not unconstitutional.  Although Plaintiff's situation is a tragic one, any alterations to the 20/40 rule that would rectify the problem must be initiated by the legislative, and not the judicial, branch of government.

### 2. Fifth Amendment Due Process Claim

Plaintiff also contends that the 20/40 rule, as applied here, violates her substantive due process rights under the Fifth Amendment. (Pl.'s Mem. Supp. Mot. Summ. J. 10-16; Pl.'s Mem. Opp. Def.'s Mot. Affirm 8-9.)  Defendant responds that Plaintiff has not shown a due process violation as she was afforded an opportunity to present her claim for disability benefits at an administrative hearing, and the amendments to the Social Security Act do not affect the 20/40 requirement. (Def.'s Mot. Affirm 10.)[10]

Under either the Equal Protection Clause, see Richardson v. Belcher, 404 U.S. 78, 81, 30 L. Ed. 2d 231, 92 S. Ct. 254, or the Due Process Clause, Flemming v. Nestor, 363 U.S. 603, 611, 4 L. Ed. 2d 1435, 80 S. Ct. 1367, a statutory classification in a social welfare program is constitutional if it is rationally based and free from invidious discrimination. Tuttle, 504 F.2d at 62; see also Harvell v. Chater, 87 F.3d 371, 373 (9th Cir. 1996).

The Due Process Clause of the Fifth Amendment requires that the government not

---

[10] Because Plaintiff is arguing that her substantive, rather than procedural due process rights were violated, it is unnecessary to consider whether she obtained a "full and fair" hearing under the standard enunciated in Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

deprive any citizen of "life, liberty, or property, without due process of law." U.S. CONST. amend. V. As an initial matter, Plaintiff has no property right to her Social Security taxes. The Supreme Court has rejected the notion that social security payments create an "investment," holding that "the noncontractual interest of an employee covered by the [Social Security] Act cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments." Flemming, 363 U.S. at 610. Because there is no property right, but only a noncontractual interest at issue, "the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." Id. at 611.

Plaintiff argues that a rule which disregards her fifteen years of full employment cannot be rationally based. Although Plaintiff is correct that this does evidence a significant contribution to the Social Security program, Congress, in enacting the 20/40 rule and the Social Security Act in general, had numerous goals, only one of which was to "afford more protection to the family as a unit." Weinberger v. Wiesenfeld, 420 U.S. at 643-44.[11] Congress also sought, with the enactment of the 20/40 rule, to make the system self-supporting, see S. Rep. No. 1987, 83rd Cong. 2d Sess., 3 U.S. Code Cong. News, 1954, at 3733; H. Rep. No. 92-231, 92d Cong. 2d Sess., 3 U.S. Code Cong. & Admin. News, 1972, at 5111, and to ensure that disability benefits were preserved for those who are currently dependent on their employment income, see S. Rep. No. 2388, 85th Cong. 2d Sess., 3 U.S. Code Cong. & Admin. News 1958, at 4229; S. Rep. No.

---

[11] The Wiesenfeld Court also noted that "[u]nderlying the 1939 [amendments] was the principle that under a social-insurance plan the primary purpose is to pay benefits in accordance with the probable needs of the beneficiaries rather than to make payments to the estate of a deceased person." 420 U.S. at 644 (internal quotations & citation omitted).

1987, 83rd Cong. 2d Sess., 3 U.S. Code Cong. News 1954, at 3729.  The 20/40 rule is rationally related to these legitimate goals.

Congress, in an effort to favor victims of ALS, recently amended the Social Security Act to allow individuals who have filed an application, are under a disability by virtue of being diagnosed with ALS, and are currently insured for disability benefits to waive the twenty-four-month waiting period for Medicare coverage.  See H.R. Rep. No. 106-1019, § 104 (2000); see also 42 U.S.C. § 426(h); 42 U.S.C. § 426(b)(2)(A); 42 U.S.C. § 423(a).  In 2003, the SSA amended its regulations to permit findings of presumptive disability with respect to claims involving ALS.  See Revised Medical Criteria for Evaluating Amyotrophic Lateral Sclerosis, 68 Fed. Reg. 51689, 51691-92 (Aug. 28, 2003) (to be codified at 20 C.F.R. pts. 404 and 416). Although Congress thus intended to aid individuals with ALS, the amendments did not alter the 20/40 requirement and did not change Plaintiff's status as not currently insured.  Plaintiff is not entitled to collect disability benefits under the statute as Congress has drawn the criteria for eligibility in a manner which does not embrace Plaintiff, no matter how sad her circumstances.

Although the 20/40 rule may not perfectly comport with all of the goals behind the Social Security Act, it does not contain an inherently invidious classification and does not impinge on fundamental rights.  The "rough accommodation" reached by the 20/40 rule may appear "illogical," however, it cannot be said that it is so arbitrary as to violate the Due Process Clause, and accordingly, it is not the province of this Court to strike it down.  See Dandridge, 397 U.S. at 485; Brown, 905 F.2d at 635.[12]  For the reasons set forth in this and the preceding section, this

---

[12] In Brown, the Second Circuit held that "[i]t is the responsibility of Congress, not the courts, to determine how public funds should be spent and how they should be raised."  The Second Circuit reasoned that "legislative decisions are constrained by fiscal necessity" and "[e]very desirable

Court finds that the 20/40 rule is not based on a "patently arbitrary classification," is rationally based, and is free from invidious discrimination. See, e.g., Harvell v. Chater, 87 F.3d 371, 373 (9th Cir. 1996); Tuttle v. Sec'y of Health, Education & Welfare, 504 F.2d 61, 62-63 (10th Cir. 1974). As such, the 20/40 rule does not violate the Due Process Clause of the Fifth Amendment.

### III.   CONCLUSION

For the reasons set forth above, the Recommended Ruling [Doc. No. 22] denying Plaintiff's Motion for Summary Judgment and granting Defendant's Motion for Order Affirming the Decision of the Commissioner is **approved** and **adopted**. Accordingly, Plaintiff's Motion for Summary Judgment [Doc. No. 10] is **denied** and Defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 15] is **granted**. The clerk is directed to close the case.

SO ORDERED.

Dated at New Haven, Connecticut, July  17 , 2006.

/s/
Peter C. Dorsey, U.S. District Judge
United States District Court

---

program cannot be funded, nor can the full needs of every funded program be met." 905 F.2d at 635.